**Opinion issued December 2, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-24-00417-CV

————————————

## IN THE INTEREST OF R.R. AND R.R., Children

———————————————————————————————

**On Appeal from the 505th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 22-DCV-295409**

———————————————————————————————

## O P I N I O N

Appellant, C.R. (Mother), challenges the trial court's termination of her parental rights to her minor children, R.R. (Rose) and R.R. (Ryan).[1] In three issues, she argues that (1) her procedural due process rights were violated; (2) the trial court abused its discretion in allowing nondisclosed expert witnesses to testify; and (3) the evidence was legally and factually insufficient to support termination of her

---

[1] Rose was born October 25, 2007. Ryan was born November 16, 2009.

parental rights under the predicate grounds of endangerment pursuant to Texas Family Code section 161.001(B)(1)(D) and (E).

We conclude that Mother waived her due process complaint, the trial court did not abuse its discretion in admitting witness testimony, and the evidence was sufficient to support the endangerment findings. Accordingly, we affirm.

## Background

The Department of Family and Protective Services (DFPS) received numerous referrals alleging that Mother was emotionally or physically abusing Rose and Ryan, dating back to 2018. Several of the referrals were "ruled out" or closed after the intake appointment. In the months leading up to the children's removal from Mother's care, on May 23, 2022, DFPS received a referral alleging emotional and physical abuse of both children. On June 9, 2022, DFPS received additional referrals alleging physical abuse, emotional abuse, and medical neglect of the children by Mother. In addition to reports that Mother had "punched, slapped, and choked" the children, Ryan reported that "he did not want to live with his mother and if he had to return to her care that he would kill himself." According to DFPS records, this prompted Ryan's admission to a mental health hospital, but Mother "left with him against medical advice."

On July 8, 2022, DFPS received another referral alleging abuse. The report detailed an incident that had occurred when police were called to the laundromat

where Mother, Rose, and Ryan were doing laundry. The report alleged that Mother had "kicked [Rose] once in the stomach and once in the face," resulting in bleeding to Rose's face and lip. The report also alleged that Mother struck Ryan and that she "makes the children sleep on the floor at the motel." A subsequent referral alleged further details of physical abuse, emotional abuse, and neglect.

DFPS investigated these various referrals and ultimately filed its original petition for protection of the children and termination of Mother's parental rights on July 26, 2022.[2] DFPS created a family plan of service requiring, among other things, that Mother obtain a psychological evaluation and that she maintain stable housing and employment. Mother met with Dr. T. Maxwell to obtain the psychological evaluation, and Dr. Maxwell provided a report that was filed with the trial court on December 29, 2022. Dr. S. Profilet provided parent-coaching services as part of DFPS's reunification efforts and met with Mother and the children on several occasions. She filed a report with the trial court on December 16, 2022, and corresponded with the children's court-appointed special advocate (CASA) ad litem. DFPS determined that reunification was not in the children's best interests and proceeded with the termination of Mother's parental rights.

---

[2]     DFPS also sought to terminate the parental rights of the children's father. The trial court ultimately ordered termination of his rights, but he is not a party to this appeal.

3

The bench trial on DFPS's petition to terminate Mother's parental rights began on January 9, 2024, and was continued on March 8 and April 26, 2024. At the time of trial, Rose was sixteen and Ryan was fourteen. Rose testified regarding numerous incidents in which Mother abused her or Ryan or engaged in inappropriate sexual behavior. Rose testified about a time that Mother dragged her by her hair and punched her. Rose testified about another occasion on which Mother found Rose watching pornography and responded by "whoop[ing]" her and forcing her to undress. Rose testified that Mother "got a pen and stuck it inside of [her]," asking, "[D]o you want this to happen to you[?]"

Rose testified about at least one occasion when Mother used inappropriate sexual language that made Rose and Ryan uncomfortable. Rose testified that she was sexually abused by her cousins, but Mother did not believe her. She also testified that, when she was thirteen, she and Ryan tried to run away, resulting in Mother beating her, punching her, and spitting on her.

Rose also testified regarding her memories of previous investigations by DFPS. She described an incident in which Mother punched her while on a call with a DFPS caseworker. Rose testified that Mother coached her and Ryan about what to say to caseworkers. Rose further testified that Mother did not teach her basic things about caring for herself, like proper hygiene or haircare. She learned how to care for herself by using the internet.

4

Ryan likewise testified about incidents of abuse and other inappropriate conduct by Mother. He testified that Mother struck him repeatedly with a candy-cane-shaped yard ornament on one occasion and with a belt on another occasion. Ryan testified that he is gay, which caused Mother to threaten him and use slurs against him. He stated that Mother told him that she would rather kill him than let him grow up to be gay, and he believed her threats. Ryan testified that he and Rose ultimately ran away to live with their father because of the way Mother abused them.

Rose testified that, when she and Ryan returned from their father's, Mother forced them to remove their clothing. Mother told them that "voices" were telling her to touch them inappropriately. Both Rose and Ryan testified that Mother looked at their naked bodies and touched them, including touching their genitals.

Rose also testified regarding the events that led to her and Ryan being taken into DFPS custody. She testified that the family was staying in a hotel, and Mother asked about the time Rose and Ryan spent with their father. Mother became upset, pulled Rose out of the bed, and "whoop[ed]" her. Mother kicked Rose after throwing her to the ground, and then punched and choked her. Rose testified that this resulted in injury to her cheek and lip. Rose reported this to the owner of the laundromat where they did their laundry, and he called the police. Ryan testified that Mother also struck him, but not as hard as Mother struck Rose.

5

Mother was charged with two counts of injury to a child related to the incident described by Rose, and she remained in jail during DFPS's initial investigation into those allegations. Ryan had to be hospitalized for mental health issues, and the children's father and other relatives refused to have the children placed with them because of their behavior and Mother's mental health.

Rose and Ryan were placed in separate foster homes at the time of trial. Rose testified that she was "doing great" in her foster home, her foster mother told her she could stay as long as she needed, and she felt safe there. She was participating in sports at school and making good grades and was making plans to attend college in the future. Rose testified that she wanted to stay in her current placement. Ryan also testified that he wished to remain in his foster placement, where he felt safe. Both children testified that they wanted Mother's parental rights terminated because she was abusive and they felt unsafe with her.

Dr. Maxwell was called to testify regarding Mother's psychological assessment on the first day of trial in January 2024. Mother objected to DFPS's intention to present expert witness testimony from Dr. Maxwell and other witnesses on the ground that DFPS had failed to designate its experts in a timely manner. DFPS responded that Mother did not file a request for disclosure as required by Texas Rules of Civil Procedure 194a and 195a, and thus, it was not required to provide her with witness lists or expert designations. DFPS further

argued that Mother could not establish surprise or prejudice because she had already met with Dr. Maxwell and Dr. Maxwell's report was provided to the trial court in December 2022. The trial court overruled Mother's objections. Dr. Maxwell went on to testify briefly the first day of trial. The bulk of her testimony, including Mother's cross-examination, occurred on the next trial day, March 8, 2024.

Dr. Maxwell testified that she evaluated Mother and diagnosed her with Antisocial Personality Disorder (APD), and Mother also met the diagnostic criteria for a general "unspecified psychosis" not due to a substance or known physiological condition. Dr. Maxwell testified about the nature of APD generally:

> It is a mental health disorder that is a personality style. It's not like a mood disorder or a childhood disorder, it's a personality that normally individuals won't really get a diagnosis for until they are 18 years or older. And so, as a result it's how the individual tends to process the world, interact within the world, and with others. And people with antisocial personality disorder, they tend to antagonize, manipulate, or treat others harshly or with callous indifferences and usually show no guilt or remorse for their behavior. Individuals with antisocial personality disorder often violate the law, becoming criminals. They may lie, behave violently or impulsively, and have problems with drugs or alcohol use. Because of these characteristics, people with this disorder typically cannot fulfill responsibilities related to family, work, or school.

Dr. Maxwell testified that Mother demonstrated traits such as hostility, significant irritability and agitation, and aggression.

Dr. Maxwell testified about the impact someone with APD could have on their children and the following exchange occurred:

[Maxwell]: A parent with this personality disorder will have a negative effect on their children and their children's overall personality, self-esteem, and self-awareness, not only with their peers, but with relationships with other adults, et cetera.

[DFPS]: And—

[Mother]: You want me to leave? Because I'll leave.

THE COURT: Let's stop for a second.

[Mother's attorney]: Can I take a break?

(Bailiff interacting with mom)

THE COURT: Briefly. Do you need a moment, [Mother]?

[Mother]: I mean, yeah. This—this carrying on like this, and I know I didn't do nothing, it's frustrating to keep hearing me being—

THE COURT: This is how the adversarial system works.

[Mother]: Yeah. So I'm going to take a break.

THE COURT: Very good. It's 11:18. Heidy, it's 11:18. Five minutes.

After the break, the trial proceeded while mother waited in the cafeteria.

Dr. Maxwell testified that children of parents with APD would feel "afraid and scared," and "would live their life or lives in constant terror and they would also tend to project how they feel about other adults and just be fearful." Following her evaluation of Mother, Dr. Maxwell had concerns about the children's mental health and recommended that they also be evaluated. She further recommended

8

that visitations not continue until the children could be evaluated and that any visitation should be supervised "for the wellbeing of [Mother] as well as the children." Dr. Maxwell was concerned about the way Mother disciplined her children. Dr. Maxwell testified that Mother did not interact appropriately during the evaluation, telling Maxwell, "[D]on't get close to me like that" or asking, "Why you looking at me like that?" Dr. Maxwell stated that she had to "deescalate" the situation. Dr. Maxwell further recommended that Mother see her physician to obtain "psychotropic medication" and that she complete parenting classes due to her "lack of awareness that something must have been wrong for Child Protective Services to have her family in this unfortunate situation."

Dr. Profilet served as a parent coach to Mother and the children. Mother again objected that DFPS had not made the expert disclosures required by the rules, and the trial court overruled her objections. Dr. Profilet testified that Mother's interactions with the children were impersonal. She did not express love for them, and she did not want to talk with them. Dr. Profilet gave the example that, during one of their sessions, Ryan stated that it was his birthday, but Mother did not say anything or wish him a happy birthday. At another session, Mother brought Ryan a birthday gift, but she also demonstrated a negative attitude toward him and acted aggressively. Mother told Dr. Profilet that she was not interested in learning anything about parenting. Dr. Profilet testified that Mother did not

9

demonstrate good parenting skills, and during one session, Dr. Profilet became concerned that Mother might harm the children or the caseworker.

The reports completed by both Dr. Maxwell and Dr. Profilet were admitted into evidence during the trial. DFPS also presented evidence of Mother's criminal history that included multiple convictions or arrests dating from 2021 back to 1998 for offenses like aggravated assault with a deadly weapon and assault causing bodily injury. DFPS also presented evidence of the two injury-to-a-child offenses that resulted in the children coming into DFPS care and were pending at the time of trial.

The DFPS caseworker, K. Turnipseed testified regarding Mother's family plan of service, created by DFPS to address the concerns that resulted in the children coming into DFPS custody. The requirements included maintaining stable housing and employment, submitting to drug testing, taking parenting classes, and fully cooperating in identifying and addressing her mental health issues. Turnipseed testified that Mother did not follow all of the recommendations regarding treating her mental health issues, nor did she complete or engage appropriately in a parenting class. Turnipseed believed that Mother completed some of the services without engaging appropriately in them.

Turnipseed testified that Mother did not help DFPS identify any potential relative placements for the children. Mother admitted that she told her relatives that

10

the children had made false accusations against her, and so the relatives were not willing to serve as temporary caregivers. Turnipseed testified that the children were placed in separate foster placements and that they could remain in those placements until they aged out of DFPS's care.

The children's CASA, T. Sledge, testified that Mother refused to talk to her. Sledge testified that the children were agitated and fearful after spending time with their Mother. She also believed that Mother was unstable and incapable of meeting the children's emotional needs or providing them with physical safety. Sledge agreed with DFPS and the children that Mother's parental rights should be terminated.

Mother also testified. She denied having any mental health issues and denied ever telling the children she heard voices telling her to touch them. She denied the allegations that she abused the children. For example, Mother denied using any slurs or threats against the children, but she admitted to disciplining them. She admitted that she caught Rose watching pornography and was concerned, but she denied putting a pen in Rose's vagina.

Mother testified that she believed she completed all of her services. She did not think there was anything she could do to improve her parenting skills, and she believed that she completed therapy successfully because she learned conflict resolution and coping techniques. Mother acknowledged that she had only visited

the children once or twice while the case was pending and that she refused some of the parent-child visits while this case was pending because she wanted "to wait until the truth is told." On the occasions that she did visit Rose, Rose testified that Mother brought her things like clothes and cosmetics, but Mother also threatened to "whoop" her, leaving Rose to believe that Mother would beat her when Mother regained custody. Ryan testified that Mother brought him clothes and other gifts that she tried to take back after a disagreement. This resulted in an altercation with Mother chasing him to get the clothes, and security being called. Mother admitted that the police were called during this visit in November 2022.

Trial court terminated Mother's parental rights under Family Code subsections 161.001(b)(1)(D) and (E) and found that termination was in the children's best interest. This appeal followed.[3]

---

[3] In a footnote in its appellate brief, DFPS points out that Mother's notice of appeal was untimely. The trial court's order was signed on May 8, 2024, and Mother's notice of appeal was filed on June 4, 2024. Thus, the notice of appeal was not filed within twenty days after the judgment was signed, but it was filed within 15 days after the deadline. *See* TEX. R. APP. P. 26.1(b) (requiring notice of appeal in accelerated case to be filed within twenty days after the judgment is signed), R. 26.3 (providing that court may extend time to file notice of appeal if, within 15 days after deadline for filing, appealing party files its notice of appeal and accompanying motion). Because the notice of appeal here was filed within 15 days of the deadline for filing, we treat the notice of appeal as an implied motion for extension of time and exercise jurisdiction over this appeal. *See Verburgt v. Dorner*, 959 S.W.2d 615, 616–17 (Tex. 1997).

**Notice of Witnesses**

In her first issue, Mother contends that her due process rights were violated, pointing to her objections at trial that DFPS failed to make a timely exchange of exhibits and witness lists and failed to make a timely designation of its expert witnesses. On appeal, Mother argues that this violated her due process rights, but she did not raise this complaint in the trial court. *See* TEX. R. APP. P. 33.1(a)(1); *see also In re B.L.D.*, 113 S.W.3d 340, 349–50 (Tex. 2003) (discussing "[i]mportant prudential concerns" behind rules on preservation of error generally in context of termination cases). "Due process violations must be raised in the trial court for them to be preserved on appeal." *In re F.E.N.*, 542 S.W.3d 752, 768 (Tex. App.—Houston [14th Dist.] 2018), *pet. denied*, 579 S.W.3d 74 (Tex. 2019); *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993) (holding that failure to raise due process and equal protection complaint in trial court waived that complaint on appeal and stating, "As a general rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal.").

Objections at trial must comport with the issue raised on appeal, and an objection regarding the admissibility of evidence does not preserve a complaint that the litigant's due-process rights were violated. *See In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) (addressing preservation of due process challenge and stating that it must be apparent from context that appellant was attempting to raise due

process challenge); *Benson v. Chalk*, 536 S.W.3d 886, 895 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (holding that party's complaint on appeal must comport with objection made in trial court).

Mother did not raise her due process complaint in the trial court, nor did she make any argument that would have made it apparent to the trial court that she was attempting to raise a due process challenge.

We overrule Mother's first issue.

In her second issue, Mother argues that the trial court abused its discretion in allowing nondisclosed expert witnesses to testify.

## A. Standard of Review

We review the trial court's decision to admit evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2017). And, even if we conclude that the trial court erred in admitting the complained-of evidence, we may not reverse the trial court's order unless we conclude the evidentiary error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case to the court of appeals. *See* TEX. R. APP. P. 44.1(a); *In re E.A.K.*, 192 S.W.3d 133, 148 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

**B.     Analysis**

At trial, Mother objected to the expert testimony of Dr. Maxwell and Dr. Profilet, asserting that DFPS did not comply with the requirements of Texas Rule of Civil Procedure 195. DFPS points out that Mother made no requests for disclosure, as required by Rules 194a and 195a, and, thus it was not obligated to provide a witness list or to designate expert witnesses in the absence of any request that it do so.

Mother cited Rule 195 both in the trial court and on appeal. However, Rule 195 governs "discovery regarding testifying expert witnesses *in suits not governed by the Family Code*." TEX. R. CIV. P. 195 (emphasis added). The Texas Legislature enacted Family Code chapter 301, creating discovery procedures for actions under the Family Code and excepting such suits from the then-existing general discovery rules set out in the Texas Rules of Civil Procedure. *See* TEX. FAM. CODE § 301.001 (providing chapter 301 applies to civil action brought under Family Code); *id.* § 301.002 (providing that chapter 301 "may not be modified or repealed by a rule adopted by the supreme court"); *see generally id.* §§ 301.001–.108 (providing discovery procedures for suits under Family Code, including provisions requiring request for disclosure and procedures governing discovery regarding testifying expert witnesses).

Rules of Civil Procedure 194a and 195a were adopted in order to implement and codify the provisions of Family Code chapter 301. *See* TEX. R. CIV. P. 194, cmt. 2023; *id.* R. 194a, cmt. 2023; *id.* R. 195, cmt. 2023; *id.* R. 195a, cmt. 2023. Rules 194a and 195a thus apply to requests for disclosures and discovery regarding testifying expert witnesses in suits governed by the Family Code. *Id.* R. 194a, 195a.

> Rule 194a.1 provides:
>
> No later than 30 days before the end of any applicable discovery period, a party may obtain disclosure from another party of the information or material described in Rule 194a.2 by serving the other party the following request: "Under Rule 194a, you are requested to disclose, within 30 days of service of this request, the information or material described in Rule [state rule, e.g., 194a.2, or 194a.2(a), (c), and (f), or 194a.2(d)-(g)]."

TEX. R. CIV. P. 194a.1. Rule 194a.2 provides the specific content subject to the disclosure set out in Rule 194a.1, including information about testifying experts. *See* TEX. R. CIV. P. 194a.2(f) (providing that party may request disclosure of information about testifying experts, including names, subject matter of testimony, and resume and biography).

Rule 195a.1 limits permissible methods for obtaining discovery regarding testifying experts in suits governed by the Family Code:

> A party may request another party to designate and disclose information concerning testifying expert witnesses only through:
>
> (a) a disclosure request served under Rule 194a.1; or

16

(b) a deposition or report permitted by this rule.

TEX. R. CIV. P. 195a.1.

It is undisputed that Mother failed to make a disclosure request as required by Rule 194a.1, nor does she point to any deposition or report sufficient to satisfy the requirements of Rule 195a.1. Thus, we conclude that the trial court did not abuse its discretion in overruling Mother's objections to DFPS's purported failure to disclose the identities of its expert witnesses. *See id.*; *see also In re J.P.B.*, 180 S.W.3d at 575 (reviewing trial court's decision to admit or exclude evidence at termination trial for abuse of discretion); *Low*, 221 S.W.3d at 614 (holding that trial court abuses its discretion when it acts without regard for any guiding rules or principles).

We further conclude that Mother cannot show that the evidentiary ruling here probably caused rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1). DFPS pointed out that both Dr. Profilet and Dr. Maxwell provided services to Mother in connection with her DFPS service plan, so they were known to Mother prior to the start of trial. Dr. Profilet's and Dr. Maxwell's expert reports were filed with trial court and provided to all parties in December 2022, more than a year before trial commenced on January 9, 2024. Finally, the anticipated expert witnesses were identified, at the latest, when the final trial started on January 9, 2024. On that first day of trial, Dr. Maxwell provided some testimony, but the trial

17

was continued until nearly two months later, on March 8, 2024. Thus, Mother had nearly two months to prepare before conducting her cross examination of Dr. Maxwell and the other experts and before she was required to present her own defense as the trial continued on March 8 and April 26, 2024. Mother has not identified, either at trial or on appeal, any way that she was prejudiced by the trial court's ruling here, and the record demonstrates that she participated extensively at trial, including by vigorously cross-examining DFPS's witnesses.

We overrule Mother's second issue.

## Sufficiency of the Evidence

In her third issue, Mother contends that the evidence was legally and factually insufficient to support the trial court's endangerment findings.

### A.    Standard of Review

To terminate parental rights pursuant to Family Code section 161.001, DFPS has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1) and (2) that termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Here, Mother does not challenge the sufficiency of the evidence to support that trial court's finding that termination is in the children's best interest, only the predicate endangerment findings. Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be

18

established." *Id.* § 101.007. The standard for reviewing legal and factual sufficiency of the evidence to support these findings reflect the elevated burden of proof. *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id.* at 630–31. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631.

Reviewing the factual sufficiency of evidence "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding," and so we "must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *see In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (holding that factfinder is sole judge of witnesses' credibility and demeanor).

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (citing TEX. FAM. CODE § 161.001(b)). Nevertheless, "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code" when the trial court's order of termination contains findings on those grounds. *Id.* at 237.

**B.    Law on Endangerment**

Subsection 161.001(b)(1)(D) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Subsection (E) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Endangerment means to expose to loss or injury; to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re M.C.*, 917 S.W.2d

20

268, 269 (Tex. 1996) (per curiam) (holding that "endanger" means to expose child to loss or injury or to jeopardize child's emotional or physical health); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but DFPS does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).

While both subsections (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment. *In re J.I.G.*, No. 01-18-00023-CV, 2018 WL 3233874, at *8 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.) (citing *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)). Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting TEX. FAM. CODE § 161.001(b)(1)(D)); *see In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) (holding, in context of subsection (D)'s focus on child's living environment, that parental conduct is relevant to child's environment). The child's "environment" encompasses the suitability of the child's living conditions and the conduct of

parents or others in the home. *In re S.R.*, 452 S.W.3d at 360. Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the children's home can create an environment that endangers the physical and emotional well-being of children as required for termination under subsection (D). *In re E.J.*, No. 14-23-00387-CV, 2023 WL 8043686, at *9 (Tex. App.—Houston [14th Dist.] Nov. 21, 2023, no pet.) (mem. op.) (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A single act or omission may support termination under subsection (D). *In re E.J.*, 2023 WL 8043686, at *9 (citing *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

Subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360; *In re J.I.G.*, 2018 WL 3233874, at *8; *In re J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re S.R.*, 452 S.W.3d at 360. "While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific

danger to the child's well-being may be inferred from parents' misconduct alone." *Id.* at 360 (citing *Boyd*, 727 S.W.2d at 533).

"Because subsections D and E both concern endangerment and the evidence on each may overlap in some respects, we address both of these predicate findings together." *In re S.R.*, 452 S.W.3d at 359–60.

## C. Analysis

Both Rose and Ryan testified that Mother repeatedly abused them. "Direct physical abuse is clearly conduct that endangers a child." *In re G.P.*, 01-16-00346-CV, 2016 WL 6216192, at *11 (Tex. App.—Houston [1st Dist.] Oct. 25, 2016, no pet.) (mem. op.); *In re L.E.M.*, No. 02-11-00505-CV, 2012 WL 4936607, at *14 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (mem. op.) (holding that children's statements of physical abuse by parents was sufficient to support endangerment finding); *see also In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment."). In addition to the children's testimony regarding Mother's physical abuse, both children also testified that they felt unsafe with Mother. Rose testified that Mother made inappropriate sexual remarks to her, and Ryan testified that Mother used slurs and derogatory language toward him.

The DFPS caseworker, Turnipseed, testified that Mother refused some visitations, expressing that she wanted "to wait until the truth is told" before seeing the children, and Mother herself acknowledged that she only visited the children a few times. In one of the visitations that Mother did attend, she had an altercation with Ryan that resulted in security being called. Dr. Profilet observed negative interactions between Mother and the children. Despite Dr. Maxwell's diagnosis that she has APD, Mother also denied that she had any need to address her mental health issues or improve her parenting. *See In re S.R.*, 425 S.W.3d at 363 (untreated mental illness are factors court can consider in determining whether parent endangered children); *In re C.W.M.P.*, No. 14-20-00571-CV, 2021 WL 244865, *7 (Tex. App.—Houston [14th Dist.] Jan. 26, 2021, pet. denied) (mem. op.) (holding that missed visitations and failure to complete court-ordered service plan may constitute evidence supporting endangerment finding because such conduct subjects children to instability and uncertainty, which endangers them).

Finally, DFPS presented evidence of Mother's extensive criminal history, including the pending charges for injury to a child she allegedly committed against the children. A parent's criminal conduct that exposes her to the possibility of incarceration can negatively impact a child's living environment and emotional well-being. *In re A.A.H.*, No. 01-19-00612-CV, 2020 WL 1056941, at *10 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.).

Thus, we conclude that DFPS presented clear and convincing evidence that Mother "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings" and "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630–31 (setting out standard for legal sufficiency review).

Mother argues that evidence of her mental health issues, standing alone, was insufficient to support the trial court's endangerment findings. She argues that "[b]iases, assumptions, and stereotypes distorted the portrayal of [Mother's] 'mental health issues,' creating a gross injustice resulting in unfair treatment." While mental illness alone is not grounds for terminating the parent-child relationship, untreated mental illness can expose a child to endangerment and is a factor courts may consider. *In re S.R.*, 452 S.W.3d at 363. Here, the trial court considered evidence of endangerment that went beyond evidence of Mother's mental illness. The evidence of Mother's criminal history and the testimony of both children regarding Mother's abusive treatment provided support for the trial court's finding that Mother endangered the children. *See id.*

Mother further contends that she completed the services assigned to her in the family plan of service and that she did not abuse the children or engage in a

25

pattern of domestic violence, asserting that the "children recanted and lied about abuse and neglect throughout the case." Mother also argues that she "was the only person who testified at trial that was actually present on the day of the removal" and that "the officer who believed the allegations that Mother ha[d] abused her children and subsequently arrested her" did not testify.

The trial court, however, was permitted to consider the testimony of the children themselves and weigh that against Mother's testimony. These issues implicate the weight and credibility of the children's testimony of abuse and Mother's credibility in denying the allegations. We defer to the trial court as the factfinder to resolve these issues. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (holding that factfinder had "full opportunity to observe witness testimony first-hand" and was "the sole arbiter when assessing credibility and demeanor of witnesses"); *In re H.R.M.*, 209 S.W.3d at 108 (holding that reviewing court must give due deference to fact finder's findings and cannot substitute its own judgment for that of fact finder); *see also In re A.C.*, 560 S.W.3d at 361 (holding that in factual-sufficiency review, appellate courts weigh "disputed evidence contrary to the finding against all the evidence favoring the finding," and "must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding").

Considering the entire record, we conclude that the disputed evidence that the trial court could not have credited in favor of the finding is not so significant that the trial court could not have formed a firm belief or conviction that its findings pursuant to subsections (D) and (E) were true. *See In re A.C.*, 560 S.W.3d at 361.

We overrule Mother's third issue.

## Conclusion

We affirm the trial court's final order terminating Mother's parental rights to both children.


Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Guerra.